IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARY ELIZABETH TURNER,                         No. 3:17-cv-00431-HZ

Plaintiff,

v.

NANCY A. BERRYHILL, Acting                     OPINION & ORDER
Commissioner of Social Security,

Defendant.

Merrill Schneider
SCHNEIDER KERR & ROBICHAUX
P.O. Box 14490
Portland, Oregon 97293

        Attorney for Plaintiff

Billy J. Williams
UNITED STATES ATTORNEY
District of Oregon
Renata Gowie
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2902

Michael S. Howard
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington 98104-7075

    Attorneys for Defendant

HERNANDEZ, District Judge:

    Plaintiff Mary Elizabeth Turner brings this action seeking judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). I reverse the Commissioner's decision and remand for an award of benefits.

## PROCEDURAL BACKGROUND

    Plaintiff applied for DIB on December 6, 2012, alleging an onset date of August 12, 2012. Tr. 165-70. Her application was denied initially and on reconsideration. Tr. 79-92, 111-14 (Initial); Tr. 93-107, 116-18 (Reconsideration). On November 12, 2014, Plaintiff appeared, with counsel, for a hearing before an Administrative Law Judge (ALJ). Tr. 53-78. On April 10, 2015, the ALJ found Plaintiff not disabled. Tr. 34-52. The Appeals Council denied review. Tr. 1-6.

## FACTUAL BACKGROUND

    Plaintiff alleges disability based on chronic pain and coagulation defects. Tr. 193. At the time of the hearing, she was fifty-four years old. Tr. 165 (showing date of birth). She is a high school graduate and has past relevant work experience as a biomedical equipment technician, a sleep technician, and a retail stocker. Tr. 46, 61.

SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(a).

Disability claims are evaluated according to a five-step procedure. *See Valentine v. Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability). The claimant bears the ultimate burden of proving disability. *Id.*

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled.

In step three, the Commissioner determines whether plaintiff's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. *Yucker*t, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform "past relevant work." 20

C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant can perform past relevant work, the claimant is not disabled.  If the claimant cannot perform past relevant work, the burden shifts to the Commissioner.  In step five, the Commissioner must establish that the claimant can perform other work.  *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets his burden and proves that the claimant is able to perform other work which exists in the national economy, the claimant is not disabled.  20 C.F.R. §§ 404.1566, 416.966.

THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date through her date of last insured.  Tr. 39.  Next, at steps two and three, the ALJ determined that Plaintiff has the severe impairment of chronic venous insufficiency, but that Plaintiff did not have an impairment or combination of impairments that meets or medically equals a listed impairment.  Tr.  41.

At step four, the ALJ concluded that Plaintiff has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except for the following: (1) she can lift or carry twenty pounds occasionally and ten pounds frequently; (2) she can sit up to six hours in an eight-hour day and can stand or walk for a total of two hours in an eight-hour day; (3) she has occasional foot control with her left lower extremity; (4) she can occasionally climb ramps and stairs but is precluded from climbing ladders and scaffolds; (5) she can occasionally kneel, crouch, and crawl; and (6) she needs a cane to ambulate.  Tr. 42.

With this RFC, the ALJ determined that Plaintiff is unable to perform any of her past relevant work.  Tr. 45-46.  However, at step five, the ALJ determined that Plaintiff is able to

perform jobs that exist in significant numbers in the economy such as cashier, small products

assembler, and electronics worker.  Tr. 47.  Thus, the ALJ determined that Plaintiff is not

disabled.  *Id.*

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the

Commissioner's findings are based on legal error or are not supported by substantial evidence in

the record as a whole.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  "Substantial

evidence means more than a mere scintilla but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (internal

quotation marks omitted).  The court considers the record as a whole, including both the

evidence that supports and detracts from the Commissioner's decision.  *Id.*; *Lingenfelter v.

Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007).  "Where the evidence is susceptible to more than

one rational interpretation, the ALJ's decision must be affirmed."  *Vasquez*, 572 F.3d at 591

(internal quotation marks and brackets omitted); *see also Massachi v. Astrue*, 486 F.3d 1149,

1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the

court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

## DISCUSSION

Plaintiff argues that the ALJ improperly assessed her subjective limitations testimony as

not fully credible, improperly rejected the opinions of two treating physicians and one non-

examining physician, improperly rejected lay witness testimony, and failed to find several

impairments severe at step two.  Based on these errors, she contends that the ALJ's step five

finding of no disability is in error.

5 - OPINION & ORDER

I.  Plaintiff's Credibility

The ALJ is responsible for determining credibility.  *Vasquez*, 572 F.3d at 591.  Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering.  *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (ALJ engages in two-step analysis to determine credibility:  First, the ALJ determines whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged"; and second, if the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give "specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms.") (internal quotation marks omitted).

When determining the credibility of a plaintiff's complaints of pain or other limitations, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence.  *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).  The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed medications, and the unexplained absence of treatment for excessive pain.  *Id.*; *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) ("The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment;

and (3) the claimant's daily activities.") (internal quotation marks omitted).

As the Ninth Circuit explained in *Molina*;

In evaluating the claimant's testimony, the ALJ may use ordinary techniques of credibility evaluation.  For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and whether the claimant engages in daily activities inconsistent with the alleged symptoms[.]  While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting[.]  Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.

*Molina*, 674 F.3d at 1112-13 (citations and internal quotation marks omitted).

The ALJ found that Plaintiff's history of deep venous thrombosis and May-Thurner Syndrome[1] could reasonably be expected to cause her alleged symptoms of pain, fatigue, coagulation defects, headaches, and limb swelling.  Tr. 42.  But, he concluded that her statements regarding the intensity, persistence, and limiting effects of these symptoms were not entirely credible.  *Id.*  In support, the ALJ discussed various parts of the medical record and then concluded that Plaintiff's complaints of severe pain when walking and standing were contradicted by "relatively normal findings" upon physical examinations by medical professionals.  Tr. 43-44.  Additionally, he cited what he considered to be a "history of no more than conservative treatment" to find that Plaintiff's "pain is not as limiting as alleged."  Tr. 44.

Plaintiff argues that the ALJ mischaracterized the medical evidence and failed to support

---

[1]  May-Thurner Syndrome is a condition where "the left iliac vein is compressed by the right iliac artery, which increases the risk of deep vein thrombosis (DVT) in the left extremity." https://my.clevelandclinic.org/health/diseases/17213-may-thurner-syndrome

the allegation that she had undergone no more than conservative treatment. Defendant contends the record supports the ALJ's determination.

The ALJ recognized that Plaintiff has a history of multiple deep vein thrombosis in her left leg and May-Thurner syndrome. Tr. 43. He noted that she had had three different thrombolysis attempts and several venous stents placed to keep her left common iliac vein open. *Id.* She also subsequently developed post-thrombotic syndrome with chronic lower extremity swelling, chronic hypercoagulable state, and subsequent abnormalities of the venous system in her left lower extremity. *Id.*

Nonetheless, the ALJ concluded that the medical records did not support Plaintiff's assertions regarding her difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, completing tasks, and concentrating, or her contention that she must keep her leg elevated and cannot sit for more than sixty minutes. Tr. 42-43. In support of this determination, the ALJ noted that in 2012, although Plaintiff repeatedly presented with complaints of pain and the records showed she continued to be symptomatic, one physician noted that she "was adjusting to a 'disabled condition.'" Tr. 43 (citing Tr. 495 (Nov. 26, 2012 chart note by Dr. Marcos Barnatan); Tr. 505 (Oct. 1, 2012 chart note by Physician's Assistant Judah Gold-Markel); Tr. 584 (Sept. 25, 2012 chart note by Dr. Rosa Garcia-Jordan)). A practitioner's observation that a patient is "adjusting" to a disabled life says nothing about the credibility of the patient's complaints. Moreover, this observation was made at the same time that Plaintiff reported that her leg pain affected her quality of life, impacted her ability to do daily activities, and that she was no longer working because of it. Tr. 495. This observation by a practitioner is not a specific and legitimate reason to discount Plaintiff's testimony.

The ALJ also relied on the fact that while an October 2012 venogram showed occlusion of the left common femoral vein and the left iliac system, it also revealed that the superficial and deep venous systems were otherwise patent and normal without thrombosis or occlusion. Tr. 43 (citing Tr. 497). The suggestion by the ALJ is that even with significant results of a complete occlusion of the left common femoral vein, sternal iliac vein, and common iliac vein, these are relatively normal results which undermine Plaintiff's complaints of pain because the test also showed that the superficial venous system appeared patent without thrombosis or occlusion and the deep venous system of the left lower extremity, distal to the common femoral vein, was otherwise patent and normal. Tr. 498.

While the Court is not a medical expert, the ALJ's rational suggests, analogously, that a claimant's complaints of leg pain are inconsistent with x-rays showing a fractured femur but also showing that the fibula and tibia are intact. Just as it would be unreasonable to discount a patient's claim of thigh pain in the face of such an x-ray, it is unreasonable to find that Plaintiff's complaints of pain resulting from the occluded vessels are not credible in the presence of non-occluded superficial or deep venous systems. Moreover, the significance of the October 2012 venogram results is demonstrated by Dr. Barnatan's chart note stating that the findings of that test were discussed at a city-wide vascular conference with the consensus that there was not a "good definitive procedure that can offer relief of venous congestion with good longterm patency." Tr. 497. The ALJ's reasoning is unsound.

The ALJ next cites to records showing that on January 31, 2013, although Plaintiff continued to report symptoms of post-thrombotic syndrome with prolonged standing or walking even while wearing compression stockings and using a cane to ambulate, her physical

examination showed no edema, cyanosis, clubbing, calf or thigh tenderness, or palpable venous cords. Tr. 43 (citing Tr. 635, 811). The chart note cited by the ALJ reports that Plaintiff continued to have symptoms of post-thrombotic syndrome despite wearing a thigh-high graduated compression stocking. Tr. 635. She was comfortable at rest but experienced moderate to severe pain with prolonged standing or walking. *Id.* The physician's impression was that Plaintiff had "recurrent massive left iliofemoral DVT." *Id.* While Plaintiff has had swelling as a symptom, the ALJ fails to explain why the lack of edema or tenderness on palpation undermines Plaintiff's allegation that she experiences moderate to severe pain after prolonged standing or walking. The record cited by the ALJ does not indicate that her physical examination occurred after such standing or walking.

Next, the ALJ notes that blood work conducted on January 31, 2013 showed that Plaintiff's coagulation testing of prothrombin time (PT) and international normalized ratio (INR) had improved significantly since August 2012 and was now within normal limits. Tr. 43. But, the exhibits cited by the ALJ in support do not, without some explanation from a medical practitioner, demonstrate that the results were normal.[2] And, Plaintiff's physician on that same date described the problems Plaintiff had in regulating her "warfarin therapy because of marked lability of the INRs for no apparent reason." Tr. 635. Because of this, Plaintiff's treating hematologist Gerald Segal, M.D. had switched her to Arixtra injections for the prior six weeks. *Id.* Then, at the January 31, 2013 appointment, he recommended switching to rivaroxaban to

---

[2] The ALJ cites to a January 31, 2013 laboratory result showing a PT Time of 9.8 and an INR of 1.0 which appear to be within their stated "Reference Range." Tr. 654. But, the report also shows different INR Therapeutic Reference Ranges, both for low intensity and high intensity coagulation ranges. *Id.* Given that Plaintiff was on the anticoagulant medication Arixtra at the time, it is unclear what result would be considered normal for Plaintiff.

avoid the need for the daily Arixtra injections. *Id.* Nothing in Dr. Segal's chart note supports the ALJ's conclusion that on January 31, 2013, Plaintiff's PT or INR testing had normalized.

However, the ALJ correctly noted that several months later, rivaroxaban appears to have stabilized Plaintiff's coagulation issues. Tr. 43 (citing Dr. Segal chart notes from June 2013, Tr. 827-28; Jan. 2014, Tr. 827-28; and July 2014, Tr. 832). Dr. Segal reported that Plaintiff was tolerating the drug well with no signs or symptoms of bleeding and normal D-dimer and hemoglobin concentration results. *Id.* (citing Tr. 828, 830, 832). The ALJ relied on Dr. Segal's conclusion that there "is no clinical or laboratory evidence for recurrent thrombosis on rivaroxaban." *Id.* (citing Tr. 832). He noted Dr. Segal's statement that she "appeared well." *Id.* (citing Tr. 832).

The problem with the ALJ's assessment of this medical evidence is that it overlooks the symptoms Plaintiff continued to experience from post-thrombotic syndrome. The same chart notes indicating that her risk for recurrent thrombosis was now low, establish that she continued to have symptoms of post-thrombotic syndrome, including moderate to severe pain with standing or walking, despite wearing a thigh-high graduated compression stocking. Tr. 827 (June 25, 2013 chart note); *see also* Tr. 829-30 (Jan. 10, 2014 chart note stating that she continued to have symptoms of post-thrombotic syndrome despite wearing a thigh-high graduated compression stocking and experienced leg pain with standing or walking; further noting that Plaintiff remained "totally disabled" as a result of her post-thrombotic syndrome and was unable to stand or walk without experiencing significant pain and writing her a prescription for a wheelchair to increase her mobility outside of her home); Tr. 831-32 (July 11, 2014 chart note again noting continued symptoms of post-thrombotic syndrome despite use of the compression stocking, leg

pain with standing or walking; opining that Plaintiff remained totally disabled as a result of her post-thrombotic syndrome). The fact that the rivaroxaban reduced Plaintiff's risk of future thrombosis does not detract from her statements about the symptoms caused by post-thrombotic syndrome. And, that she "appeared well" during the examination with Dr. Segal does not detract from her description of symptoms attributed to standing or walking.

The ALJ recites an incident in November 2014 in which Plaintiff experienced extreme leg pain while flying from Oregon to Texas in late 2014. Tr. 43. This caused her to be admitted to the hospital for three days and resulted in a diagnosis of "acute on chronic deep vein thrombosis" and possible arteriorvenous fistula. *Id.* (citing Tr. 813). Testing also showed a complete occlusion of the left common iliac vein stent. Tr. 820. At the time, Plaintiff's left leg was more swollen than her right but the calf and thigh were soft with mild tenderness to palpation. Tr. 44 (citing Tr. 874). The ALJ notes that upon discharge, "her discomfort was controlled fairly well," that she was doing "markedly better" than upon admission, and that the Texas physician opined she did not need an interior vena cava filter. *Id.* (citing Tr. 864-65, 874).

The ALJ's characterization of the record is not completely accurate. The hospital chart note does indicate that her pain was controlled "fairly well" while in the hospital, but that control was accomplished initially by using a pain medication pump operated by Plaintiff and then by using a fentanyl patch. Tr. 864. At the time of discharge, she was still using the fentanyl patch as well as both oxycodone and OxyContin. Tr. 865. Thus, the ALJ's implication that her statements are not credible because her pain was controlled while in the hospital overlooks the amount of pain medication she was on and fails to note her hearing testimony shortly after this incident that she continued to experience leg pain. Tr. 72-73.

Additionally, the filter was not recommended by the Texas physician because, in his opinion, Plaintiff's "risk for pulmonary embolus in the face of the occluded iliac vein stent would be extremely low." Tr. 875 (further explaining that the "risks of filter placement and having a filter would probably outweigh its benefits in this particular setting"). As I understand the chart note, the filter was not recommended because the stent was already occluded, meaning an embolus was unlikely to travel further. Thus, the fact that the filter was not recommended is not an indication that Plaintiff was not suffering pain from post-thrombotic syndrome.

Next, the ALJ noted that "multiple physicians" had advised against aggressive interventions such as venous bypass surgery absent a further deterioration of her condition, and that more aggressive procedures had not been performed. Tr. 44 (citing Ex. 6F at 45 (Tr. 728), 6F at 57 (Tr. 740), 8F at 19 (Tr. 800)). Two of the three records cited by the ALJ do not support this assertion. Exhibit 6F at 57 is the first page of a January 31, 2013 chart note by Plaintiff's primary care provider Rosa Garcia-Jordan, M.D. Tr. 740. There, Dr. Garcia-Jordan recites that Plaintiff's medical history is most significant for post-thrombotic syndrome with a left leg deep vein thrombosis in August 2010, felt to be partly due to development from a post-operative clot. *Id.* (noting that "she also has May-Thurner syndrome."). Dr. Garcia-Jordan remarked that Plaintiff had already undergone "[s]everal aggressive attempts" "through interventional radiology" to try and resolve her condition but without clinical improvement. *Id.* In Dr. Garcia-Jordan's opinion, Plaintiff was "quite limited in terms of activity" and was on long-term disability. *Id.* Dr. Garcia-Jordan noted that Plaintiff was taking chronic pain medication, she used a cane at all times, she "is slow," and if she is "too active," her pain increases at the end of the day. *Id.* She needs a wheelchair if she is walking extensively. *Id.* Nothing in the cited page

or the following page which completes the chart note for that particular visit, mentions venous bypass surgery or advice against any other "aggressive interventions." Tr. 740-41.

Exhibit 8F at 19 is the first page of a two-page chart note by Dr. Garcia-Jordan of an April 12, 2013 office visit. Tr. 800. There, Dr. Garcia-Jordan reported that Plaintiff had been unable to continue regular work due to chronic issues related to a left leg deep vein thrombosis and subsequent post-thrombotic syndrome. *Id.* Dr. Garcia-Jordan observed that it "is clear she is unable to return to work." *Id.* Dr. Garcia-Jordan stated that Plaintiff wore compression stockings, required regular pain medication, and was still very limited. *Id.* She explained that Plaintiff had "an exhaustive evaluation by interventional radiology as well as [by] Dr. Barnatan. It was felt that no further intervention would be of any benefit." *Id.* Far from supporting the ALJ's finding, this chart note suggests that additional interventions would not be therapeutic.

The third record cited by the ALJ in support of his finding that Plaintiff's physicians have advised against more aggressive interventions, is a September 25, 2012 chart note by Dr. Garcia-Jordan. Tr. 728. There, Dr. Garcia-Jordan noted that Plaintiff had been off of work since August 16, 2012, per the recommendation of Dr. Barnatan. *Id.* In reviewing Dr. Barnatan's last consultative note from a July 23, 2012 office visit, Dr. Garcia-Jordan noted that in that chart note, Dr. Barnatan had advised against venous bypass surgery unless Plaintiff had severe debilitating pain or nonhealing venous stasis ulcers. *Id.* He also had recommended "upscaling beyond compression stockings to Circads" for two months, as well as "strict elevation" which is why she was placed on work leave. *Id.* Two months later at her September 25, 2012 visit with Dr. Garcia-Jordan, Plaintiff had noticed no improvement in her symptoms and continued to have pain with the Circads. *Id.*

14 - OPINION & ORDER

Dr. Garcia-Jordan recited that she discussed returning to work with Plaintiff and both of them felt that it was "not plausible at this time." *Id.* She noted that Plaintiff's limited ability to sit for a prolonged period of time might impact her ability to ever return to full work duties. *Id.* Plaintiff and Dr. Garcia-Jordan discussed her pain management control using both OxyContin and oxycodone. Tr. 729. Her then-current pain management regimen left her feeling pain at a 5 out of 10 with a peak of 7. *Id.* Dr. Garcia-Jordan discussed optimizing Plaintiff's pain management control by increasing the OxyContin. *Id.*

The ALJ's citation to this record is not entirely inaccurate because Dr. Garcia-Jordan does mention the venous bypass surgery. But, Dr. Garcia-Jordan was not the primary source of the recommendation against venous bypass surgery. Instead, she just commented on Dr. Barnatan's July 23, 2012 chart note. Dr. Barnatan examined Plaintiff on July 23, 2012. Tr. 509-19. Two weeks earlier, Plaintiff was examined by Dr. James Ballard, a vascular surgery fellow, along with Dr. Barnatan. Tr. 520-29. The chart note from the July 9, 2012 examination shows a surgical history including the placement of a left common iliac vein stent in August 2010, a venogram in May 2012, and a venous balloon angioplasty also in May 2012. Tr. 523. Dr. Ballard recited that it was after the left iliac vein stent in 2010 that Plaintiff developed post-thrombotic syndrome and continued to have difficulty with leg swelling resulting in an "angio for partial occlusion of the stent" in January 2011. Tr. 526. Despite the venoplasty in May 2012, she still experienced swelling and heaviness in her left leg. *Id.* The thigh high compression stockings helped with the symptoms but did not alleviate them. *Id.* Her quality of life and ability to do daily activities were suffering due to her pain. *Id.* Dr. Ballard reported that Plaintiff continued to be symptomatic despite the reintervention to address the in-stent restenosis. *Id.* He noted that she

had not had evaluation for chronic venous insufficiency to evaluate both superficial and deep system. *Id.* He believed she might require an additional venogram and would require further testing before any treatment recommendations could be made. *Id.*

Two weeks later, Dr. Barnatan explained Plaintiff's disease course similarly to Dr. Ballard's recitation in that she had a left lower extremity deep vein thrombosis in August 2010, underwent "lysis" at that time and was diagnosed with May-Thurner Syndrome. *Id.* She underwent a left iliac vein stent but then developed post-thrombotic syndrome. *Id.* She continued to have difficulty and underwent the "angio" for partial occlusion of the stent in January 2011. *Id.* Then, she had had a venoplasty for recurrent stenosis in May 2012. *Id.*

Dr. Barnatan noted that Plaintiff's leg swelling and heaviness occurred almost immediately after taking off her compression stocking which Plaintiff described as helping her symptoms but not alleviating them. *Id.* Dr. Barnatan stated that Plaintiff continued to be symptomatic despite reintervention and that despite being compliant with compression stocking use, she was having difficulty completing her shifts at work. Tr. 518. He planned to "maximize conservative therapy with compression and elevation." *Id.* This included a recommendation of circades instead of compression stockings. *Id.* He noted that venous bypass would be "[a]nother option," but it would be a "last resort treatment" which would not be recommended unless Plaintiff developed non-healing venous stasis ulcerations or if she could not tolerate current symptoms. *Id.* If that were the case, he would obtain a venogram first. *Id.*

Plaintiff did in fact have another venogram on October 12, 2012. Tr. 498. This was after another visit with Dr. Barnatan on October 1, 2012. Tr. 508. This is the venogram previously discussed above which showed complete occlusion of the left common femoral vein, sternal iliac

vein, and common iliac vein, and which prompted Dr. Barnatan to discuss the results at a city-wide vascular conference with the consensus that there was not a "good definitive procedure that can offer relief of venous congestion with good longterm patency." Tr. 497. On November 26, 2012, Dr. Barnatan wrote that considering the results of the October 12, 2012 venogram, the plan was to continue "medical therapy unless symptoms become unbearable" and then he would proceed with a veno-venous bypass but "with the understanding that patency might be unpredictable with hard to manage INR on coumadin." *Id.*

The medical records show that Dr. Barnatan recommended a venous bypass but only as a last resort and only in the presence of non-healing venous ulcerations or if Plaintiff's symptoms became unbearable. The ALJ's finding that "multiple physicians" had advised against aggressive interventions such as venous bypass surgery absent a deterioration of Plaintiff's condition misstates the record. The only physician who made that statement is Dr. Barnatan. Dr. Garcia-Jordan simply referred to Dr. Barnatan's record in her own September 25, 2012 chart note.

The ALJ appears to have relied on Dr. Barnatan's statement as support for his finding that Plaintiff has a "history of no more than conservative treatment." This interpretation of the record is not reasonable. The record undeniably shows that Plaintiff has undergone multiple interventional procedures in an attempt to address her symptoms. In this context, just because she has not undergone the "last resort" surgery does not undermine her subjective pain and limitations complaints. She testified at the hearing that with the combination of her pain medication, the use of the compression stocking, and elevating her leg, the pain is bearable. *E.g.*, Tr. 69, 72-73. That Plaintiff's combination of these methods makes her pain bearable and thus, makes the "last resort" of aggressive interventional procedures not a recommended option does

not mean that her statements are not credible.

The facts here are distinguishable from cases where, for example, complaints of disabling pain have been treated with over-the-counter analgesics. *E.g.*, *Adame v. Colvin*, No. 6:16-cv-01761-PK, 2017 WL 6947878, at *8 (D. Or. Nov. 29, 2017) (use of only over-the-counter pain medication and physician's note that pain was controlled with Motrin and Tylenol supported ALJ's negative credibility determination), *adopted*, 2018 WL 443462 (D. Or. Jan. 12, 2018); *Shermer v. Colvin*, No. 3:12-cv-01932-SI, 2014 WL 2013403, at *7 (D. Or. Apr. 29, 2014) (use of only over-the-counter ibuprofen to treat allegedly debilitating back pain evidenced conservative treatment and supported ALJ's negative credibility determination); *see also Berkebile v. Berryhill*, No. 16-15846, 2017 WL 4712498, at *1, ____ F. App'x ____ (9th Cir. Oct. 20, 2017) (evidence that the claimant managed his physical pain through conservative treatment such as ibuprofen and neck pillow supported ALJ's rejection of examining physician's opinion). The ALJ's finding that Plaintiff has a history of only conservative treatment is not supported by the record and is not a basis in this case for finding her not credible.

Finally, the ALJ noted that Plaintiff managed to work for two years despite being diagnosed with May-Thurner Syndrome on August 7, 2010. Tr. 44 (citing Tr. 824). The record does not support the ALJ's finding. *E.g.*, Tr. 534 (Jan. 20, 2011 chart note stating that she was on leave from work and feared losing her job permanently); Tr. 518 (July 2012 chart note indicating that Plaintiff was having difficulty completing her shifts). Instead, the record shows that Plaintiff was sometimes on leave after her diagnosis and when she was working, she had problems completing her duties.

In summary, none of the reasons put forth by the ALJ for discounting Plaintiff's

subjective testimony are supported by the record. Contrary to the ALJ's determination, Plaintiff's treatment history has not been conservative and the fact that she has not yet undergone the "last resort" surgery (which may not provide relief in any event) is not a sufficient basis to discredit her testimony. Contrary to the ALJ's determination, Plaintiff's ability to work after August 2010 was impaired. And, also contrary to the ALJ's determination, the medical record does not show that she had "relatively normal physical findings." The ALJ erred in finding Plaintiff's subjective limitations testimony not credible.

II. Physician Opinions

Plaintiff argues that the ALJ improperly rejected the opinion of a non-examining physician and two treating physicians.

A. Non-Examining Physician

The ALJ found that the state agency medical consultants at the initial and reconsideration level opined that Plaintiff would be capable of performing work at the light exertional level and could stand and/or walk for two hours and sit for about six hours in an eight-hour workday. Tr. 44. The ALJ gave these opinions "considerable weight" because they were consistent with the record as a whole. *Id.*

Plaintiff argues that the ALJ erred because at least one of the non-examining state agency physicians, Dr. Marin Kehrli, M.D., opined that Plaintiff was limited to sedentary work. Defendant responds that Plaintiff is misreading the record and that the limitation to "sedentary work" was an assessment by "an agency staff-person." Def.'s Resp. 7. Because it was not actually Dr. Kehrli's opinion, it was not binding on the ALJ. Moreover, Defendant continues, Dr. Kehrli opined that Plaintiff could lift twenty pounds occasionally and stand or walk for up to two

hours in a workday, findings consistent with the ALJ's RFC.

Contrary to Defendant's assertion, the record fairly suggests that Dr. Kehrli opined that Plaintiff was limited to sedentary work. At best, it is ambiguous and requires further explanation before the ALJ may rely on it for support that Plaintiff can perform "light" work. Exhibit 3A is the Commissioner's denial of Plaintiff's claim at the reconsideration level. Tr. 93-105. It has several parts, including an RFC assessment at pages 101-03. There, Plaintiff is noted to have the ability to occasionally lift or carry twenty pounds, frequently carry ten pounds, stand or walk for a total of two hours in an eight-hour workday, and sit about six hours in an eight-hour work day. Tr. 102. Other limitations were also assessed including limits on pushing and pulling with the lower extremities. *Id.* At the end of this section, Dr. Kehrli's typed "signature" appears with the date September 12, 2013. Tr. 103. The next section contains an assessment of vocational factors. Tr. 103-05. Here, the document states that based "on the seven strength factors of the physical RFC (lifting/carrying, standing, walking, sitting, pushing, and pulling)," Plaintiff's maximum sustained work capability is sedentary. Tr. 104. The sedentary assessment is confirmed by a citation to Medical-Vocational Guideline § 201.15 which applies only to those whose maximum sustained work capability is sedentary work. *Id.*; *see* 20 C.F.R. Pt. 404, Subpt. P, App. 2 §§ 201.01-201.29. Notably, the next section recites the "not disabled" determination which is then followed by Dr. Kehrli's typed "signature" for a second time and which is also dated September 12, 2013, along with the typed "signature" of the disability adjudicator Michael Fisher, dated September 16, 2013. Tr. 105.

Dr. Kehrli's signature at the end of the document is reasonably interpreted to signify his approval of the report's contents and determination. The inclusion of a sedentary limitation

preceding his signature suggests that Dr. Kehrli agreed with the sedentary assessment. While the sitting and standing RFC limitations in the document correlate to a "light" finding, the "sedentary" determination in the report is based on all seven of the physical RFC limitations. Given that the report assessed Plaintiff with limitations in pushing and pulling, it is possible that these limitations placed her in the sedentary range. Moreover, the cited sedentary "grid" rule provided for a not disabled determination based on a finding that Plaintiff had transferable skills. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.15. Thus, Dr. Kehrli's signature following a determination of "not disabled" is not inconsistent with a sedentary work limitation.

The record is simply unclear as to whether Dr. Kehrli or disability adjudicator Fisher determined that Plaintiff was limited to sedentary work. Given the ambiguity, the ALJ should not have given the opinion great weight without further explanation.

B. Treating Physicians

Social security law recognizes three types of physicians: (1) treating, (2) examining, and (3) nonexamining. *Garrison*, 759 F.3d at 1012. If the treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight. *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014); *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). If the treating physician's opinion is not contradicted by another doctor, the ALJ may reject it only for "clear and convincing" reasons supported by substantial evidence in the record. *Ghanim*, 763 F.3d at 1160-61.

Even if the treating physician's opinion is contradicted by another doctor, the ALJ may not reject the treating physician's opinion without providing "specific and legitimate reasons"

which are supported by substantial evidence in the record. *Id.* at 1161; *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). And, when a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the ALJ must still articulate the relevant weight to be given to the opinion under the factors provided for in 20 C.F.R. §§ 404.1527(c)(2)-(6); *Id.* at 1161; *Orn*, 495 F.3d at 632-33.

 1. Dr. Garcia-Jordan

Dr. Garcia-Jordan was Plaintiff's primary care provider. Several times during her treating relationship, Dr. Garcia-Jordan remarked that Plaintiff was unable to work based on her limitations. In April 2013, she noted that it "is clear [Plaintiff] is unable to return to work. She wears compression stockings and requires regular pain medication and still is very limited." Tr. 800 (further stating "I do not feel she is capable of returning to work" and renewing her medical leave). In September 2013, Dr. Garcia-Jordan opined that Plaintiff was

> unable to continue working as she is really unable to sit for any prolonged period of time. . . . I reviewed [Plaintiff's] limitations, which are extensive. At best, she is only able to sit for 30 minutes and usually it is at home in a recliner with her legs elevated. Any prolonged sitting beyond 30 minutes causes severe pain in the left lower extremity. She uses a cane for ambulation and stability. She is only able to ambulate very minimal distances. Even a drive to the store requires her to simply sit at the front of the store while her husband does much of the shopping. If she stands for too long a period of time her leg starts to buckle spontaneously. She is no longer able to shower, requiring bathing or sitting in a bathtub.

Tr. 931.

In 2014, Dr. Garcia-Jordan continued to opine on Plaintiff's limitations and inability to work. *E.g.*, Tr. 960 (June 5, 2014 chart note stating that Plaintiff continued to experience "persistent debilitating left lower extremity pain"; further noting that Plaintiff was "unable to

ambulate extensive distances"; remarking that Plaintiff's ongoing limitations were noted in previous office visit chart notes; finding that Plaintiff was "medically stationary" and writing a prescription for a wheelchair); Tr. 971 (Sept. 22, 2014 chart note stating that Plaintiff ambulated with a cane, that Plaintiff had noticed more falls as she "feels her left leg gives way," and further stating that in Dr. Garcia-Jordan's opinion, "she is not able to return to work in any capacity due to her limitations.").

The ALJ rejected Dr. Garcia-Jordan's September 2013 limitations opinion and the opinion that she is unable to work, stating:

> The undersigned gives this opinion little weight as it is vague and somewhat inconsistent with the record as a whole. Medical records from after the date Dr. Garcia-Jordan authored this opinion indicate the claimant was tolerating her medication well and that physical examinations revealed relatively normal findings. . . . whether a claimant is able to work is a matter reserved for the Commissioner. As such, the undersigned gives these statements no weight.

Tr. 45.

Plaintiff argues that there is nothing vague about an opinion that Plaintiff cannot tolerate sitting for more than thirty minutes. Similarly, the opinion that she can ambulate only short distances is reasonably specific even without containing a precise duration or distance. Plaintiff also argues that the ALJ does not explain how the opined limitations are contrary to the medical record as a whole. In fact, Plaintiff contends, the records the ALJ cites to show that her physical examinations revealed "relatively normal findings" do not support that assertion. Rather, Plaintiff argues, Dr. Garcia-Jordan's opinion is supported by the evidence of record showing Plaintiff's decline in functioning over time, contrary to the ALJ's determination.

Defendant concedes that the ALJ's reliance on a supposedly "vague" opinion from Dr.

Garcia-Jordan "may not have been a specific and legitimate reason to discount the doctor's opinion" because Dr. Garcia-Jordan did in fact "spell out [her] opinions in a more detailed manner on one occasion." Def.'s Resp. 6; *see also id.* at 4-5 (noting Dr. Garcia-Jordan's opinions that Plaintiff was unable to sit for more than thirty minutes and unable to stand or walk for long periods of time). Still, Defendant argues that the ALJ's rejection of Dr. Garcia-Jordan's opinion was not in error. First, Defendant contends that medical opinions that a patient is "disabled" or unable to work are opinions on an issue reserved the Commissioner and are not due "any special significance." 20 C.F.R. § 404.1527(d)(3); *see Thomas v. Barnhart*, 278 F.3d 947, 956 (9th Cir. 2002) (treating physician opinion "not necessarily conclusive" on ultimate issue of disability). Second, Defendant cites to medical records showing the absence of swelling and the lack of tenderness to palpation as support for the ALJ's determination that the physical examinations revealed relatively normal findings. And, Defendant reasserts the ALJ's statement that Plaintiff was responding well to medication.

Even without specific functional limitations, "an ALJ may not simply reject a treating physician's opinions on the ultimate issue of disability." *Ghanim*, 763 F.3d at 1161. Instead, the contradicted opinions may be rejected only by "providing specific and legitimate reasons that are supported by substantial evidence." *Id.* Defendant's suggestion that the ALJ need not have commented on Dr. Garcia-Jordan's less specific opinions that Plaintiff was unable to work at all is inconsistent with the law. The ALJ still needed to explain why such opinions were not being afforded any weight.

As to the medical record, for the reasons previously explained, the medical record does not show relatively normal findings. While Plaintiff did not always experience swelling or

tenderness to palpation, she continued to experience severe symptoms caused by her post-thrombotic syndrome which were controllable only by narcotic pain medication, use of a compression stocking, use of a cane or a wheelchair, and sitting with her leg elevated. In addition, the amount of time she can sit with her leg elevated was limited. Further, I agree with Plaintiff that her ability to tolerate her medication well does not undermine Dr. Garcia-Jordan's opinion because Plaintiff's disabling symptoms of an inability to sit for more than thirty minutes or to stand or walk for long periods of time have persisted despite the use of such medication.

The bases articulated by the ALJ for rejecting Dr. Garcia-Jordan's functional assessment are either disavowed by Defendant, not supported by the medical record, or are not reasonable. Thus, the ALJ failed to give specific and legitimate reasons for rejecting Dr. Garcia-Jordan's functional assessment and opinions on Plaintiff's inability to work.

### 2. Dr. Segal

Plaintiff's treating hematologist Dr. Segal observed that Plaintiff "remain[ed] totally disabled as a result of her post-thrombotic syndrome" and that she was "unable to stand or walk without experiencing significant pain." Tr. 830 (Jan. 10, 2014 chart note). Six months later, he offered a similar opinion. Tr. 832 (July 11, 2014 chart note).

The ALJ noted that the record contained several "statements" from Dr. Segal "essentially concluding the claimant is disabled and unable to work." Tr. 45. However, he gave these statements no weight because whether a claimant is able to work is a matter reserved for the Commissioner. *Id.*

As *Ghanim*, cited above, makes clear, the ALJ may not simply reject a treating physician's opinion on the ultimate issue of disability out of hand but must instead provide

specific and legitimate reasons that are supported by substantial evidence.  763 F.3d at 1161.

Here, the ALJ provided no basis for rejecting Dr. Segal's opinion other than the "ultimate

disability" nature of that opinion.  This was error.

In defense of the ALJ's decision, Defendant argues that Dr. Segal's opinion that Plaintiff

could not stand or walk without experiencing significant pain is not a specific enough finding to

be accorded weight.  But, because this is not a reason given by the ALJ for failing to credit Dr.

Segal's opinion, I do not consider it.  *Marsh v. Colvin*, 792 F.3d 1170, 1172 (9th Cir. 2015) (court

cannot affirm the agency on a ground not invoked by the ALJ without violating the *Chenery* rule)

(citing *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (stating that a

reviewing court may only affirm agency action on "the grounds invoked by the agency").  The

ALJ failed to give specific and legitimate reasons in support of rejecting Dr. Segal's opinion.

III.  Lay Witness Testimony

Plaintiff's husband Dan Turner provided a third-party function report with his assessment

of Plaintiff's limitations.  Tr. 209-16.  He reported that Plaintiff was unable to do much physical

activity, that she spent time reclining with her foot elevated and compression sock on, that she

was unable to take showers, that she needed a cane to ambulate and had difficulty with stairs, that

she was limited in her ability to do any housework or yard work because of pain, swelling, and

her leg giving out, that she was able to walk for only about twenty minutes at a slow pace, that

she used a wheelchair as needed, and that she had limitations in lifting, squatting, bending,

standing, walking, sitting, kneeling, stair climbing, memory, completing tasks, and concentrating.

*Id.*

The ALJ gave Turner's statements "little weight" because

it is a lay opinion based upon casual observation, rather than objective medical examination and testing. Further, it is potentially influenced by loyalties of family. In addition, it is not consistent with the record as a whole, especially with regard to the claimant's normal physical findings and the fact that her condition seems to be relatively well-managed with medication. Ultimately, this statement is not persuasive for the same reasons set forth above in finding the claimant's allegations to be less than wholly credible.

Tr. 45.

"Lay testimony as to a claimant's symptoms or how an impairment affects the claimant's ability to work is competent evidence that the ALJ must take into account." *Molina*, 674 F.3d at 1114. The ALJ must give reasons "germane to the witness" when discounting the testimony of lay witnesses. *Valentine v. Comm'r*, 574 F.3d 685, 694 (9th Cir. 2009).

Although only "germane" reasons are required to reject a lay witness's testimony, Defendant wisely concedes that the first two reasons set forth by the ALJ are not defensible. Def.'s Resp. 8. Nonetheless, Defendant argues that the assertion by the ALJ that Turner's opinion was inconsistent with the record as a whole, and particularly in regard to the "normal physical findings" and management on medication, is a germane reason. *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (inconsistency with medical evidence is a germane reason for discrediting lay witness testimony). The problem here is that the medical evidence, for the reasons previously explained, is not inconsistent with Turner's testimony because it does not show that Plaintiff has normal physical findings. And, even on medication she experiences significant limitations in her activities. Thus, the ALJ erred in disregarding Mr. Turner's lay opinion statements.

IV. Step Two

Plaintiff argues that the ALJ erred by improperly rejecting several impairments at step

two. Plaintiff's briefing contains a list of such impairments, followed by dozens of page cites with no further explanation other than that these records show that she has been diagnosed with, suffers serious symptoms from, and has been treated for these impairments. Pl.'s Op. Brief 13; *see also* Pl.'s Reply 5. She contends that these records are sufficient to meet the step two *de minimus* requirement.

Plaintiff's simply pointing to various medical records in support of her argument is not particularly helpful. For example, the ALJ did discuss Plaintiff's depression and concluded it was not a severe impairment at step two based on Plaintiff's statements during an April 2013 consultative examination, records showing that she presented with normal mood and affect, and a July 2013 test indicating that her mental condition was stable. Tr. 40. Plaintiff's citation to evidence in the record showing that she complained of depression, Tr. 728, received medication for the condition, Tr. 729, 739, 789, 901, 922, 930, and received a diagnosis of depression, Tr. 727, 739, 789, 901, 922, 930, does not, without more, address why the ALJ's analysis was in error. Additionally, as to her assertion of "chronic pain syndrome" as an impairment, the records cited by Plaintiff show that this was not an impairment separate from the pain caused by her post-thrombotic syndrome. Tr. 742-43, 809, 901, 931, 949, 959.

Given the summary nature of Plaintiff's step two argument, I decline to address this contention any further.

V. Remand

In social security cases, remands may be for additional proceedings or for an award of benefits. *E.g., Garrison*, 759 F.3d at 1019 (explaining that if "additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded[,]"

but "in appropriate circumstances courts are free to reverse and remand a determination by the Commissioner with instructions to calculate and award benefits") (internal quotation marks omitted).

To determine which type of remand is appropriate, the Ninth Circuit uses a three-part test. *Id.* at 1020; *see also Treichler v. Comm'r*, 775 F.3d 1090, 1100 (2014) ("credit-as-true" rule has three steps). First, the ALJ must fail to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion. *Garrison*, 759 F.3d at 1020. Second, the record must be fully developed and further administrative proceedings would serve no useful purpose. *Id.* Third, if the case is remanded and the improperly discredited evidence is credited as true, the ALJ would be required to find the claimant disabled. *Id.* To remand for an award of benefits, each part must be satisfied. *Id.; see also Treichler*, 775 F.3d at 1101 (when all three elements are met, "a case raises the 'rare circumstances' that allow us to exercise our discretion to depart from the ordinary remand rule" of remanding to the agency).

Plaintiff argues that remand for benefits is appropriate because the record is fully developed, further administrative proceedings would serve no useful purpose, and if the improperly discredited evidence is accepted as true, the ALJ would be required to find Plaintiff disabled. Defendant argues that additional proceedings are required because Plaintiff's prior work experience was skilled and there is a genuine dispute as to whether she could work in a more demanding position such as the cashier position discussed by the vocational expert. Defendant notes that in that position, Plaintiff could use a cane.

I agree with Plaintiff. First, step one is satisfied because the ALJ failed to provide legally sufficient reasons for rejecting both Plaintiff's testimony and her treating physicians' opinions.

Second, the record is fully developed. Defendant's argument that there is a dispute about Plaintiff's ability to perform the cashier position ignores that the cashier position is classified as light work, not sedentary work. Tr. 62. The medical evidence and Plaintiff's testimony establish that she can perform no more than sedentary work. *See* 20 C.F.R. § 404.1567(a) (a sedentary job "involves sitting" as well as a "certain amount of walking and standing"; "[j]obs are sedentary if walking and standing are required occasionally and other sedentary criteria are met"). With her restrictions of thirty minutes of sitting at a time, needing to elevate her leg, and limitations on standing and walking, she would be limited, at most, to sedentary work. Even without considering whether Dr. Kehrli's opinion is one of sedentary or light work and even without considering what specific limitations on standing and walking Dr. Segal would assess, the record shows that Plaintiff has the physical RFC of no more than sedentary work. No conflicts or ambiguities impede this finding and Defendant points to no evidence in the record that the ALJ overlooked. Thus, step two is satisfied.

Finally, at step three, the vocational expert testified that Plaintiff's past work was skilled, semi-skilled, and unskilled. Tr. 61. The vocational expert then testified that none of these jobs would provide transferable skills to sedentary level jobs. Tr. 62. Thus, under the Medical-Vocational Guidelines, the ALJ would be directed to find Plaintiff disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2 §§ 201.12, 201.14 (directing a finding of disability for a person closely approaching advanced age who is a high school graduate or more and whose recent education does not provide for direct entry into skilled work, and whose previous work is unskilled, or semi-skilled or skilled but whose skills are not transferable). Thus, under this regulatory definition, Plaintiff is disabled and an immediate award of benefits is appropriate.

CONCLUSION

The Commissioner's decision is reversed and remanded for an award of benefits.

IT IS SO ORDERED.

Dated this _____ day of _____, 2018

_____
Marco A. Hernandez
United States District Judge